UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| THOMAS MCCARTHY, et al., | Case No. 3:09-CV-5120-RBL |
| Plaintiffs, | |
| v. | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| JAMES BARRETT, et al., | |
| Defendants. | [Dkt. #59, 64, 66, 67, 68]. |

THIS MATTER comes before the Court upon Defendants' Motions for Summary Judgment. [Dkt. #59, 64, 66, 67, 68]. The Court has considered the entirety of the record herein, and for the reasons set forth below, the Court GRANTS the motions in part and DENIES the motions in part.

## I. BACKGROUND

This action arises out of the Milwaukee Way Antiwar Protest in 2007. Plaintiffs Thomas McCarthy, Phan Nguyen, Elizabeth Rivera Goldstein, Leah Coakley, Patrick Edelbacher, and Charles Bevis participated in the protest and were arrested for violating a rule established by the Tacoma Police Department (TPD) that prohibited protestors from bringing backpacks into the designated protest zone.

In March 2007, the United States military used the civilian Port of Tacoma to load and ship military vehicles and equipment for deployment to the wars in Iraq and Afghanistan. On the night of March 3rd, military Strykers began moving in convoys from Fort Lewis to the port

ORDER - 1

where the vehicles were then staged on port property, awaiting arrival of the ship that would take them overseas. Citizens gathered along Milwaukee Way to protest the use of the port for military purposes, to voice their opposition to the surge of troops for the war in Iraq, and to support the soldiers who would be deployed as part of the surge. On this first night, no protest zone had been established.

The protest lasted for eleven days [Wang Dec., Dkt. #79-5, at 1] and took place in an industrial area far removed from any stores or restaurants. [Wang Dec., Dkt. #81-7, at 8]. Typically, there were between thirty and forty protestors, peaking on Friday March 9th at approximately 150. [Wang Dec., Dkt. #79-5, at 7-11]. During the night of March 4th, TPD designated a protest area along the east side of Milwaukee Way between the fence and the road. [*Id.* at 7]. The street has no sidewalks but is lined with large gravel shoulders. [Miller Dep., Dkt. #77-5, at 8-9]. At first, the only instruction given to the protesters was that they could not cross the east fog line onto Milwaukee Way because the Strykers were being moved down that street. [Barrett Dep., Dkt. #77-9, at 33-34, 49; Jagodinski Dep., Dkt. #77-8, at 14]. To form barriers between the protestors and the road, TPD used members of the Disorder Response Team (DRT) who were dressed in full riot gear with their names covered up. [Barrett Dep., Dkt. #77-9, at 48-49]. Protestors were allowed to travel north and south along the gravel shoulder of Milwaukee Way. [Miller Dep., Dkt. #77-5, at 8-9]. From the shoulder, protestors could see the soldiers driving the Strykers and were able to effectively communicate their message to them.

The parties in this case disagree about what occurred after the protest zone was established and after the rule to not cross the fog line was communicated to the protestors. Plaintiffs assert that on March 4th, the protestors were peaceful and obeyed the rules, but TPD suddenly began erecting barricades to prevent protestors from walking north on Milwaukee Way. [Jagodinski Dep., Dkt. #77-8, at 15]. Plaintiffs further contend that they were given no notice that the restrictions were going to change, and as a result, they felt disoriented and intimidated. [Coakley Dep., Dkt. #76-1, at 16]. To effectuate the rule change, bicycle officers formed a line perpendicular to the road and used their bikes in a "wheels up" formation to push the protestors back. [Jagodinski Dep., Dkt. #77-8, at 18].

Defendants, however, maintain that the northern barrier was added suddenly because protestors became emotionally charged and verbally abusive. [Wang Dec., Dkt. #79-5, at 7]. They used bullhorns, tambourines, and drums to make noise. *Id.* Several protestors were wearing anarchist colors and covered their faces with bandanas. *Id.* Others were seen with large folding knives clipped to their pockets. *Id.* Their demeanor "appeared to be one of preparation to take on the police." *Id.* Furthermore, one officer testified that the protestors were given both vocal and visual cues that, effective immediately, they were no longer able to travel north up Milwaukee Way. [Jagodinski Dep., Dkt. #77-8, at 15]. On this night, three protestors (none of whom are the plaintiffs) were arrested for assault. [Wang Dec., Dkt. #79-5, at 7].

By March 5th, vehicles were no longer allowed to park along Milwaukee Way. [Barrett Dep., Dkt. #77-9, at 12-13]. Defendants claim this restriction was implemented for traffic safety; Plaintiffs contend that TPD intended to prevent protestors from going back and forth to their cars. On March 6th, Defendants observed several protestors wearing bandanas over their faces. [Barrett Aff., Dkt. #61, at 6]. One sergeant testified to seeing a protestor with a backpack that was "heavily laden." [Barrett Dep., Dkt. #77-9, at 60-61]. After the protestors were gone for the night, a backpack filled with chains and padlocks was found in the protest zone. [Barrett Dep., Dkt. #77-9, at 22-23].

The next afternoon, on March 7th, TPD implemented a "no-bag" rule, prohibiting any individual from entering the protest zone with a backpack, large bag, or cooler. [Wang Dec., Dkt. #84-6, at 1-2]. TPD maintains that it adopted and enforced the no-bag rule in order to prevent protestors from bringing chains and locks (such as the ones discovered in a backpack the night before), which could be used as "direct action" devices to stop the movement of the Strykers. [Barrett Dep., Dkt. #77-9, at 26]. Gary Smith, TPD's intelligence analyst, concluded that the chains indicated planning and preparation for human blockades, although he never inspected the protest area or the chains. [Smith Dep., Dkt. #78-5, at 61-63]. Nevertheless, Defendants argue that before and during the protest, police obtained intelligence that the protestors were planning direct action, which had occurred during antiwar protests in Olympia, Washington, in 2006. [Barrett Aff., Dkt. #61, at 7-8]. To ensure the safety of the public, the Strykers, and the

protestors, TPD adopted the no-bag rule. [*Id.* at 12-13]. Plaintiffs argue that TPD relied on faulty intelligence (which came primarily from internet searches and listserv postings), and that TPD never had any evidence of a concrete plan to engage in direct action or any other criminal activity. [Pl. Reply, Dkt. #74, at 11-12]. Instead, Plaintiffs contend that Defendants implemented the rule because they had a general and unsubstantiated fear of anarchists, and they intended to suppress or chill the protestors' antiwar speech. *Id.*

A checkpoint was set up at the entrance of the Milwaukee Way protest zone for the purpose of enforcing the new no-bag rule. [Barrett Dep., Dkt. #77-9, at 50-51]. There is conflicting testimony about whether the rule was reduced to writing, but it is clear that determining what constituted a "large bag" was left to the complete discretion of each individual officer. [Paris Dep., Dkt. #78-1, at 4-5]. The evidence shows that they all had widely varied interpretations. [*Compare* Heilman Dep., Dkt. #78-8, at 7 (concluding a large bag meant something larger than an average size purse) *with* Strickland Dep., Dkt. #77-6, at 31 (stating any bag was prohibited regardless of whether it was a small fanny pack or large mountaineering backpack)].

The only alternative to the no-bag rule that TPD considered was the implementation of voluntary searches, but Defendants ruled out that option after deciding it would be difficult to explain to protestors, it might violate the Fourth Amendment, and it would not treat all protestors equally. [Sheehan Dep., Dkt. #77-3, at 16; Barrett Dep., Dkt. #77-9, at 63-65]. Protestors were allowed to bring lawful items, such as food, water, and medicine, but if they wanted to enter the protest zone, they could not carry such items in a backpack, large bag, or cooler. [Barrett Aff., Dkt. #61, at 12].

Consequently, protestors had to either walk the mile back to their car to dispose of their bags or risk stashing them somewhere outside the protest zone. Defendants have also maintained that if the protestors wanted to keep their bags, they could have simply protested outside of the designated zone. [Barrett Aff., Dkt. #61, at 12].

During the time that the no-bag rule was in effect, no attempt was ever made to prohibit weapons from the protest zone, even though several protestors were seen carrying knives

throughout the week. [Barrett Dep., Dkt. #77-9, at 14-15]. No attempt was made to prevent protestors from carrying chains or locks underneath their coats. [*Id.* at 40-42]. Rather, TPD simply imposed a blanket restriction that prohibited anyone from carrying a large bag or backpack into the protest zone.

In the early morning hours of March 8th, after the no-bag rule had already been implemented, TPD discovered a hole dug underneath the fence and two metal pipes, each sixteen feet long, stashed on the east side of Milwaukee Way where the protestors had gathered earlier that night. [Wang Dec., Dkt. #79-5, at 8]. TPD concluded that when coupled with the chains found the day before, the pipes were evidence that the protestors intended to attempt to disrupt the convoys. *Id.*

By Friday, March 9th, the Strykers were all staged on private port property. *Id.* Convoys would no longer make their way down Milwaukee Way or any other public road, so TPD moved the designated protest zone to East 11th Street. *Id.* When selecting this new location, TPD took into specific consideration whether the zone was within sight of the ship where the Strykers were being loaded. [Barrett Aff., Dkt. #61, at 12]. The zone was set up as close to the movement as safely possible on public streets. *Id.* Snipers were placed on rooftops surrounding the newly designated protest zone, floodlights were aimed inside the zone, and law enforcement continuously videotaped protestors. [Bevis Dep., Dkt. #76-6, at 7]. To enter the protest area, protestors had to go through a checkpoint where TPD continued to enforce the no-bag rule. [Barrett Dep., Dkt. #77-9, at 52-55]. Several protestors voiced their objection to the rule and asked the officers for an explanation but were simply told that it was a safety issue. [Heilman Dep., Dkt. #78-8, at 20-21].

On Friday afternoon, Plaintiff McCarthy borrowed a young woman's backpack and entered the protest zone. Defendant Hannah Heilman immediately arrested him for carrying a backpack into the protest zone. [Barrett Dep., Dkt. #77-9, at 36-37]. Defendants admit that after McCarthy was transported to jail, TPD stopped enforcing the no-bag rule that day. [Def. Answer, Dkt. #21, at 16].

Sometime after midnight on March 10th, approximately seventy-five protestors

collectively decided to leave the protest zone and head back towards their cars parked near the intersection of Milwaukee Way and Lincoln Avenue. [Edelbacher Dep., Dkt. #76-8, at 22-23]. The parties dispute what happened next. Plaintiffs maintain that when they arrived at the intersection, they sat down in front of a line of riot police and barricades and began singing "Give Peace a Chance." [Coakley Dep., Dkt. #76-1, at 17-18]. Suddenly, TPD fired tear gas canisters directly into the crowd. Plaintiffs witnessed other protestors being pepper sprayed. [Edelbacher Dep., Dkt. #76-8, at 26]. All of the plaintiffs who were in the crowd when the less-lethal munitions were used were too afraid to participate during the next night's protest; instead, they next returned to the Port in daylight hours. [Bevis Dep., Dkt. #76-6, at 17]. Defendants, on the other hand, contend that the tear gas and pepper balls were used to disperse an aggressive crowd that was illegally marching and illegally blocking a public street. [Wang Dec., Dkt. #79-5, at 9].

Defendant Todd Kitselman arrested Plaintiffs Bevis, Coakley, Edelbacher, Goldstein, and Nguyen on the afternoon of Sunday March 11th for bringing backpacks into the East 11th Street protest zone. [*Id.* at 10]. Plaintiff Goldstein carried her asthma inhaler, vinegar-soaked rags, Maalox, two rain ponchos, swim goggles, bottled water, and a teddy bear. [Homan Aff., Dkt. #60, Ex. 8, at 16-17]. Plaintiff Coakley had turned her bag into a sign and wrote political messages on it with a black Magic Marker. [Homan Aff., Dkt. #60, Ex. 6, at 20]. Plaintiff Nguyen carried only a copy of the U.S. Constitution in his bag. [Homan Aff., Dkt. #60, Ex. 10, at 11-12].

Throughout the March 2007 protest, TPD regularly monitored the protestors' activities— they used cameras to zoom in on protestors' faces; they ran checks on license plates and followed vehicles; and they used false identities to gain access to the public listservs of organizations such as the Tacoma Students for a Democratic Society (Tacoma SDS) [Smith Dep., Dkt. #78-5, at 75; Caron Dep., Dkt. #77-10, at 4].

After the protest, TPD continued surveillance against Tacoma SDS and individuals that they assumed were members of the organization in an attempt to establish a criminal predicate. It directed specific surveillance against the plaintiffs. [Caron Dep., Dkt. #77-10, at 5-6]. It ordered

officers to conduct "roll-bys" of plaintiffs' homes. [*Id.*; Adamson Dep., Dkt. #78-2, at 9]. Plaintiffs claim this conduct caused them significant anxiety and fear. [Coakley Dep., Dkt. #76-1, at 6-7]. TPD continued monitoring the plaintiffs and their student organization for over two years after the port protests. It never obtained any evidence that Plaintiffs were engaging in or planning to commit criminal conduct. [Adamson Dep., Dkt. #78-2, at 9-10].

Plaintiffs claim that TPD's overall response to the protest, including their arrests and the no-bag rule, violated their civil rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution. [Pl. Am. Comp., Dkt. #19, at 27-28]. They also contend that TPD's surveillance during and after the protest violated their right to privacy under the Washington State Constitution. [*Id.* at 30-31]. Plaintiffs allege a number of state tort claims against various defendants, including false arrest, false imprisonment, assault and battery, outrage, and malicious prosecution. [*Id.* at 31-32]. Plaintiffs also seek to hold the City of Tacoma liable for the alleged constitutional violations. *Id.* Finally, Plaintiffs maintain that the City is liable for failure to train its police officers on how to protect protestors' right to free speech during a political demonstration. *Id.*

Defendants have filed five separate motions, moving for summary judgment on all claims and arguing in part that the individual defendants are entitled to qualified immunity:

1. Defendants move for summary judgment on the First Amendment claims against the individual defendants and the *Monell* claims against the City of Tacoma. [Def. Motion, Dkt. #59].

2. Defendants move for summary judgment on the Fourth and Fourteenth Amendment claims. [Def. Motion, Dkt. #64].

3. Individual defendants move for summary judgment pursuant to the doctrine of qualified immunity. [Def. Motion, Dkt. #66].

4. Defendants move for summary judgment on the state constitutional claims as well as Plaintiffs' requests for declaratory and injunctive relief. [Def. Motion, Dkt. #67].

5. Defendants move for summary judgment on all remaining claims, including the torts of false arrest, false imprisonment, assault and battery, outrage, and malicious

prosecution. Defendants also move for summary judgment on Plaintiffs' request for punitive damages. [Def. Motion, Dkt. #68].

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when the record shows that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *U.S. v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990). When a properly supported motion for summary judgment is made, the burden then shifts, and the opposing party must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. Put another way, summary judgment should be granted when the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor. *Id*. at 252. When viewing the evidence at this stage, all justifiable inferences are drawn in favor of the nonmoving party. *Id*. at 255.

### B. Background for Section 1983 Claims Against the Individual Defendants

Plaintiffs allege that nine individually named defendants violated their civil rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution, and they assert claims under 42 U.S.C. § 1983. "Liability under section 1983 must be based on the personal involvement of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Although Defendants argue that Plaintiffs do not identify with specificity the acts of each individual defendant that resulted in the alleged deprivation of constitutional rights, this section illustrates that Plaintiffs did in fact meet this burden.

#### 1. Plaintiffs' Allegations Against Sergeant James Barrett

Plaintiffs claim that Defendant Barrett is liable for alleged violations of their civil rights because (a) he recommended the adoption of the no-bag rule; (b) he assisted as on-scene commander for other law enforcement officers at the designated protest area; (c) as on-scene

commander, he gave protestors the ground rules only once each evening and failed to ensure that all protestors who ultimately arrived were aware of the rules; (d) he served as the Assistant Tactical Commander of the Disorder Response Team (DRT), which twice deployed less-lethal munitions; and (e) he reiterated and enforced the "zero-tolerance" policy.

### 2. Plaintiffs' Allegations Against Officer Hannah Heilman

Plaintiffs claim that Defendant Heilman is liable for alleged violations of their civil rights because she enforced the no-bag rule and arrested Plaintiff McCarthy for violating the rule.

### 3. Plaintiffs' Allegations Against Lieutenant Alan Roberts

Plaintiffs claim that Defendant Roberts is liable for alleged violations of their civil rights because (a) he recommended the adoption of the no-bag rule; (b) he participated in the development and approval of the no-bag rule; and (c) he assisted as on-scene commander for other law enforcement officers at the designated protest area.

### 4. Plaintiffs' Allegations Against Sergeant Todd Kitselman

Plaintiffs claim that Defendant Kitselman is liable for alleged violations of their civil rights because (a) he assigned officers to create the entrance checkpoint on March 11th; (b) he enforced the no-bag rule; and (c) he directed the arrests of Plaintiffs Nguyen, Goldstein, Coakley, Edelbacher, and Bevis.

### 5. Plaintiffs' Allegations Against Sergeant Barry Paris

Plaintiffs claim that Defendant Paris is liable for alleged violations of their civil rights because (a) he instructed other Tacoma Police officers to enforce the no-bag rule; and (b) he directed the arrest of individuals who failed to comply with the rule, including the arrest of Plaintiff McCarthy.

### 6. Plaintiffs' Allegations Against Captain Thomas Strickland

Plaintiffs claim that Defendant Strickland is liable for alleged violations of their civil rights because (a) he assisted as on-scene commander for other law enforcement officers during the protest; (b) he suggested that checkpoints be set up in order to stop protestors from coming into the designated protest area with backpacks; (c) he participated in the development and

approval of the no-bag rule; and (d) he directed the implementation of the no-bag rule, which resulted in Plaintiffs' allegedly unlawful arrests.

7.  <u>Plaintiffs' Allegations Against Captain Michael Miller</u>

Plaintiffs claim that Defendant Miller is liable for alleged violations of their civil rights because (a) he assisted as day-shift incident commander during the protest; (b) he participated in the development and approval of the no-bag rule; and (c) he directed the implementation of the no-bag rule, which resulted in Plaintiffs' allegedly unlawful arrests.

8.  <u>Plaintiffs' Allegations Against Assistant Chief Robert Sheehan</u>

Plaintiffs claim that Defendant Sheehan is liable for alleged violations of their civil rights because (a) he participated in the development of the no-bag rule; (b) he approved the implementation of the no-bag rule; (c) he implemented tactics to discourage antiwar protestors from demonstrating; and (d) he failed to properly train officers on the parameters of protestors' constitutional rights.

9.  <u>Plaintiffs' Allegations Against Chief Donald Ramsdell</u>

Plaintiffs claim that Defendant Ramsdell is liable for alleged violations of their civil rights because (a) he approved and ratified the no-bag rule; (b) he implemented tactics to discourage antiwar protestors from demonstrating; and (c) he failed to properly train officers on the parameters of protestors' constitutional rights.

**C. First Amendment Claims**

Plaintiffs allege that Defendants violated their First Amendment rights to free speech, to free assembly, and to petition the government for redress, and they assert a claim under 42 U.S.C. § 1983. In order to succeed on this claim, a plaintiff must demonstrate that (1) a person deprived the plaintiff of a federal constitutional or statutory right, and (2) the person acted under color of state law when doing so. 42 U.S.C. § 1983. Defendants do not dispute that they were acting under color of state law at all times relevant to Plaintiffs' claims. [Def. Motion, Dkt. #59, at 7].

///

///

1. <u>A reasonable jury could conclude that Defendants' response was motivated by an improper intent to deter a lawful protest.</u>

Plaintiffs argue that Defendants planned a response to the protests that was not motivated by a need to prevent or mitigate any actual or plausible threats to the public safety, but instead was designed to deter anarchists and others from engaging in political speech at the Port of Tacoma. In order to prove a prima facie First Amendment violation, Plaintiffs must show that (1) deterrence of speech is a "substantial or motivating factor," and (2) the official's act would deter or chill "a person of ordinary firmness from future First Amendment activities." *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (quotations and citation omitted).

A defendant cannot escape liability because a plaintiff persists in the protected activity; rather, the dispositive question rests on whether the official acted with an improper intent to deter lawful speech. *Id.* Circumstantial evidence is sufficient to survive a summary judgment motion. *Id.* at 1301. Viewing all inferences in favor of the nonmoving party, Plaintiffs have presented enough evidence to raise a triable issue of fact about whether Defendants' response to the protest was motivated by an improper intent.

First, there is evidence from which a reasonable jury could conclude that Defendants intended to deter protestors' speech based on their association with certain student political organizations. For example, Defendants' contemporaneous reports, emails, and testimony show that when TPD learned that military vehicles would be shipped out of the Port of Tacoma, law enforcement focused its attention on Tacoma SDS and the Port Militarization Resistance (PMR), assuming the members of these organizations were anarchists. [*See, e.g.*, Wang Dec., Dkt. #81-7, at 12; Smith Dep., Dkt. #78-5, at 47-50; Miller Dep., Dkt. #77-5, at 5; Barrett Aff., Dkt. #61, Ex. 7, at 5].

Defendants regularly monitored the websites and activities of Tacoma SDS, and their reasons for doing so were potentially based on inaccurate and biased assumptions as opposed to a genuine concern that violent activity needed to be prevented. [Smith Dep., Dkt. #78-5, at 39-40]. Although TPD certainly was not required to simply ignore the calls of protestors to "Fuck shit up" or "Tear it down," it was required to adequately consider the protestors' First

Amendment rights when developing a plan to ensure public safety at the protest. *See Fogel v. Collins*, 531 F.3d 824 (9th. Cir. 2008). Controversial political rhetoric is protected speech. *See Snyder v. Phelps*, 131 S. Ct. 1207 (2011). Therefore, without establishing that the protestors' alleged anarchist associations posed an actual and immediate threat to public safety, a response to deter their political speech would have been improper. *See Fogel*, 531 F.3d at 824. Numerous testimony shows that TPD never found any indication beyond generalized threats over the internet that the individuals they believed to be anarchists were planning criminal activity. [Smith Dep., Dkt. #78-5, at 61-62; Caron Dep., Dkt. #77-10, at 11-12; Adamson Dep. Dkt. #78-2, at 9-10, 14].

Defendants argue that Plaintiffs' First Amendment claims should be dismissed because Plaintiffs provided no evidence that anarchists were excluded from the protest; rather, the evidence demonstrates that assumed anarchists were present and fully participating. [Def. Reply, Dkt. #86, at 9]. However, liability does not turn on whether speech was actually silenced. Liability turns on whether Defendants *intended* to deter lawful speech. *Mendocino*, 192 F.3d at 1300 (emphasis added).

Accordingly, a reasonable jury could conclude that Defendants designed a response to deter speech based upon their assumptions of the protestors', and in particular Plaintiffs' political ideology. Defendants have not shown as a matter of law that deterring the speech of assumed anarchists was not a substantially motivating factor for their conduct.

Second, a reasonable jury could conclude from the evidence of the numerous and frequently changing restrictions employed throughout the entire protest that Defendants intended the restrictions to deter individuals from protesting. Plaintiffs argue that the zero-tolerance policy, the increasing restrictions on parking, the lack of notice when the designated protest zones were changed or moved, the no-bag rule, the snipers on the rooftops, the floodlights shining directly in the zone, and the use of cameras to zoom in on protestors created an intimidating environment, and that Defendants intentionally created that environment in order to deter individuals from protesting at the port. [Pl. Reply, Dkt. #74, at 37-38]. With respect to the no-bag rule specifically, Plaintiffs have presented evidence from which a reasonable jury could

conclude that TPD intended for the rule to deter individuals from participating in the protests. For example, an entry in the Computer Aided Dispatch (CAD) Log states, "We only have a handful of protestors here…The no-bag rule is stopping them." [Wang Dec., Dkt. #80-3, at 3].

Plaintiffs also contend that the evidence of the use of less-lethal munitions demonstrates that Defendants were motivated by the desire to silence the protestors' speech. [Pl. Reply, Dkt. #74, at 24-25].[1] For example, they argue that launching tear gas into an entire crowd because of aggressive behavior by protestors at the front near the line of police officers shows that Defendants were not motivated by public safety. [*Id.* at 38]. Plaintiffs further argue that even if the protestors were aggressive and illegally blocking an intersection as Defendants maintain, [Def. Reply, Dkt. #86, at 8], it is unclear how spraying tear gas, which sent nearly all of the protestors running into the streets, would be an effective method for ensuring the safety of the public roads.

Viewed in the light most favorable to the Plaintiffs, the evidence and inferences establish that Defendants' overall response to the port protest was motivated by an intent to deter lawful political speech. The factual dispute with respect to Defendants' intent is precisely the type of question that must be resolved by a jury.

2. A reasonable jury could conclude that the no-bag rule was not a proper time, place, and manner restriction because it was not narrowly tailored to achieve public safety.

Plaintiffs next argue that the no-bag rule violated their First Amendment rights because it was not a reasonable time, place, and manner restriction. In traditional public forums, content-based restrictions on speech are constitutional only if they survive strict scrutiny—the restrictions must be narrowly tailored and necessary to achieve a compelling government interest. Content-neutral restrictions are reviewed under intermediate scrutiny, which allows time, manner, and place restrictions if the regulation is narrowly tailored to achieve a significant government interest and leaves open ample alternatives for expression. The Supreme Court has consistently recognized that traditional public fora occupy "a special position in terms of First

---

[1] While Defendants argue in their reply that the Court should not consider any argument concerning excessive force, Plaintiffs are not attempting to revive any excessive force claims. Rather, the use of less-lethal munitions is presented only as evidence to support Plaintiffs' First Amendment claim that Defendants intended to silence their antiwar speech.

Amendment protection." *Snyder*, 131 S. Ct. at 1218. For the purposes of free speech and assembly protection, "public streets are the archetype of a traditional public forum." *Id.*; *see also Seattle Affiliate of the October 22nd Coalition to Stop Police Brutality, Repression and the Criminalization of a Generation v. City of Seattle*, 550 F.3d 788 (9th Cir. 2008). Therefore, the government's ability to restrict free speech in these locations is very limited.

### a. Content-Based

Grounded in their argument that TPD adopted the rule in order to deter individuals with antiwar or anti-government beliefs from participating in the port protests, Plaintiffs maintain that the no-bag rule was a content-based restriction. The "principal inquiry" for determining the content neutrality of a time, place, and manner restriction is "whether the government had adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  In other words, "government regulation of expressive activity is 'content neutral' if it is justified without reference to the content of regulated speech." *Hill v. Colorado*, 530 U.S. 703, 721 (2000).

As discussed in section II.C.1 above, Plaintiffs have shown that there is a genuine issue of material fact as to whether TPD's response, including the implementation and enforcement of the no-bag rule, was motivated by an improper intent to deter antiwar or anti-government speech. The same analysis applies here, and therefore, Defendants have not shown as a matter of law that the no-bag rule was content-neutral.

### b. Narrowly Tailored

Plaintiffs next contend that even if the no-bag rule was content-neutral, it was not narrowly tailored to achieve a significant government interest. Defendants' assertion that they had a significant interest in ensuring public safety during the protest is undisputed.

The narrow tailoring analysis does not require the regulation to be the least restrictive means of furthering the government's interest, but the restriction may not substantially burden more speech than necessary to further the interests. *Menotti v. City of Seattle*, 409 F.3d 1113, 1130-31 (9th Cir. 2005). Thus, "[a] statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Id.* at 1130 (quoting *Frisby v.*

*Schultz*, 487 U.S. 474, 485 (1988)). For the following reasons, Defendants have not demonstrated as a matter of law that the no-bag rule was narrowly tailored to achieve the significant government interest in ensuring public safety.

First, Plaintiffs have demonstrated that there is a genuine dispute as to whether the no-bag rule was narrowly tailored to achieve TPD's interest in keeping dangerous items out of the protest zone. Defendants argue that given law enforcement's specialized training and experience they reasonably believed the protestors presented a credible threat to public safety, which necessitated the no-bag rule. [Def. Reply, Dkt. #86, at 16]. The repeated justification for the rule was that the police found a backpack with chains in it, which led them to conclude the protestors were planning to construct direct action devices. [Barrett Dep., Dkt. #77-9, at 25; Miller Dep., Dkt. #77-5, at 20; Strickland Dep., Dkt. #77-6, at 3, 22-23]. But Defendants never made an effort to prohibit any type of weapon, or even chains and locks themselves, from the protest zone. [Caron Dep., Dkt. #77-10, at 16; Barrett Dep., Dkt. #77-9, at 40-41; Miller Dep., Dkt. #77-5, at 25-26; Sheehan Dep., Dkt. #77-3, at 15-16]. While Defendants were not required to adopt the least restrictive regulation, they still must show that the means adopted could accomplish the desired outcome. *Menotti*, 409 F. 3d at 1130. Defendants have not shown as a matter of law how allowing knives and other weapons into the protest zone while at the same time prohibiting backpacks regardless of what they carried furthered the objective of ensuring safety within the designated protest area.

Second, Plaintiffs have also shown that there is a genuine dispute as to whether the no-bag rule was narrowly tailored to achieve the interest in allowing the convoys and other traffic to move safely. By March 9th, the Strykers were no longer moving through public roadways. [Wang Dec., Dkt. #79-5, at 8]. Defendants, however, continued to maintain that the no-bag rule was necessary to prevent the protestors from disrupting the military vehicles as was done in 2006 during the protests at the Port of Olympia. [Strickland Dep., Dkt. #77-6, at 33-36; Barrett Dep., Dkt. #77-9, at 57; Barrett Aff., Dkt. #61, at 13]. But it is unclear how preventing large bags from *inside* the protest zone would have any effect on the protestors' conduct outside the zone, which is where they would need to be if they wanted to use chains and locks to blockade public

roadways. Moreover, Defendants point to the fact that if protestors wanted their bags, they could have protested outside the designated protest zone. [Def. Reply, Dkt. #86, at 3; Barrett Aff., Dkt. #61, at 12]. Based on that argument, it is again unclear how the no-bag rule was tailored to prevent individuals from obstructing the streets.

### c. Alternative Channels

The final step in analyzing whether a time, place, and manner restriction on free speech is constitutional is whether the rule left open other alternative channels for individuals to communicate their message. A time, place, and manner restriction does not violate the First Amendment "simply because there is some imaginable alternative that might be less burdensome on speech." *United States v. Albertini*, 472 U.S. 675, 689 (1985). Generally, the Supreme Court will not declare a regulation unconstitutional for failure to leave open alternative channels unless the rule will "foreclose an entire medium of public expression across the landscape of a particular community or setting." *Ctr. for Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153, 1170 (9th Cir. 2003) (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 555 (9th Cir. 1998)). But an "alternative mode of communication may be constitutionally inadequate if the speaker's 'ability to communicate effectively is threatened.'" *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (quoting *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984)).

In this case, the evidence shows that the no-bag rule left open ample opportunity for Plaintiffs to communicate their message. If protestors wanted to keep their bags, then they could have protested outside the designated zone. While Defendants do maintain that the protest area on East 11th Street was the closest and safest place for protestors to communicate their message during the time the Strykers were staged on private port property, individuals still could have effectively protested outside the zone.

In summary, Plaintiffs have shown that there is a genuine issue of material fact as to (1) whether Defendants' overall response to the Milwaukee Way Protest, including the no-bag rule, was motivated by an improper intent to deter political speech, and (2) whether the no-bag rule was narrowly tailored to achieve the Defendants' significant interest in public safety. However,

because Defendants claim that they are protected by the doctrine of qualified immunity, the resolution of Plaintiffs' First Amendment claims will be addressed in section II.F of this Order.

**D. Fourth Amendment Claims**

Plaintiffs allege that Defendants violated their Fourth Amendment right to be free from unreasonable seizures.

1. There is an issue of fact as to whether the suspicionless checkpoints at the entrance of the designated protest zone constituted an unreasonable seizure.

Plaintiffs first contend that the checkpoints at the entrance of the protest zone were unconstitutional seizures.[2] A seizure occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Dunn v. Hyra*, 676 F. Supp. 2d 1172, 1185 (W.D. Wash. 2009) (quoting *Soldal v. Cook County*, 506 U.S. 56, 61 (1992)). In addition, "the government's interference with an individual's possessory interests in property must be reasonable under the circumstances." *Id.* Ordinarily, a search or seizure without individualized suspicion is unreasonable under the Fourth Amendment. *Id.* Moreover, there are very limited exceptions to this rule. For example, brief, suspicionless seizures of vehicles at fixed Border Patrol checkpoints are reasonable because they are specifically designed to intercept illegal immigrants. *See United States v. Martinez-Fuerte*, 428 U.S. 548 (1976).[3] Additionally, sobriety checkpoints are also reasonable because of their particular purpose in removing drunk drivers from the road. *See City of Indianapolis v. Edmond*, 531 U.S. 32 (2000). The Supreme Court has "never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Id.* at 41. Furthermore, the Court has explicitly held that "a general interest in crime control is not a justification for a regime of suspicionless stops," and

---

[2] Defendants maintain that Plaintiffs failed to analyze whether the checkpoints in this case even constituted a seizure. [Def. Reply, Dkt. #86, at 22]. This argument is disingenuous. The protestors were stopped by law enforcement officers and informed that they were not allowed to enter the protest zone with their bags. This policy certainly interfered with the protestors' possessory interest in their backpacks and therefore resulted in a seizure under the Fourth Amendment. *See Soldal*, 506 U.S. at 61. While it is true that the protestors were technically free to leave the checkpoint, in order to do so they would have had to either forfeit their bag or forfeit their First Amendment rights to free speech and assembly within the designated protest zone area.

[3] While Defendants chastise Plaintiffs for relying on *Martinez-Fuerte*, they fail to acknowledge that the Border Patrol checkpoints were held constitutional in that case, even without individual suspicion or probable cause, only because of the extremely particular purpose served by the checkpoints, namely securing our national borders. The question in the present case is the same: whether the government's purpose went beyond general crime control so that the checkpoints could be found reasonable even without individualized suspicion.

such a program would "contravene the Fourth Amendment." *Id.* at 41-42.

In this case, Defendants have not presented evidence from which the Court can conclude as a matter of law that the protest zone checkpoints, where protestors were stopped and informed that they could not enter with their backpacks, were for any specified purpose other than general crime control. They have, however, demonstrated that the checkpoint stops and no-bag rule were blanket restrictions enforced without any individualized suspicion of wrong-doing. [Ramsdell Dep., Dkt. #77-1, at 14-15; Miller Dep., Dkt. #77-5, at 21-23; Barrett Dep., Dkt. #77-9, at 36-37]. Moreover, as shown by the officers' depositions, the evidence gathered from TPD's surveillance activities never indicated that Tacoma SDS had any concrete plans to engage in any criminal activity during the Milwaukee Way Protest. [Smith Dep., Dkt. #78-5, at 61-62; Caron Dep., Dkt. #77-10, at 11-12; Adamson Dep. Dkt. #78-2, at 9-10, 14]. Therefore, there is an issue for trial as to whether the suspicionless checkpoints were unreasonable seizures within the meaning of the Fourth Amendment.

2. <u>There is an issue of fact as to whether Defendants had probable cause to arrest Plaintiffs for violating the no-bag rule.</u>

Plaintiffs further argue that their Fourth Amendment right to be free from unreasonable seizures was violated because Defendants arrested them without probable cause. "A warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Whether probable cause exists depends on the totality of the circumstances and the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. *Id.*

In this case, both parties simply rely on their disputed legal conclusions. Plaintiffs claim that because the no-bag rule was unlawful, Plaintiffs' arrests for violating the rule constituted an unconstitutional seizure. [Pl. Reply, Dkt. #74, at 59]. Defendants maintain that because the City has the authority to take measures necessary to protect public safety, then clearly the no-bag rule was lawful, and therefore, the officers had probable cause to arrest the Plaintiffs for obstruction. [Def. Reply, Dkt. #86, at 22].

As stated previously, when viewing all inferences in favor of the nonmoving party,

Plaintiffs have shown that there is a question of fact as to whether the no-bag rule was lawful.[4] Furthermore, it is "established law that no one should suffer harm by asserting a constitutionally protected right." *Jackson v. Gates*, 975 F.2d 879 (9th Cir. 1992) (stating that "because the right to be free from unreasonable searches is contained explicitly in the Fourth Amendment, it follows that the right to be free from adverse consequences for refusing to submit to an unreasonable search must also be found there").

Because the question of whether the no-bag rule was constitutional is unresolved, this Court cannot determine if there was probable cause for Plaintiffs' arrests as a matter of law. However, Defendants claim they are protected by the doctrine of qualified immunity, so the resolution of Plaintiffs' Fourth Amendment claims will be addressed in section II.F of this Order.

**E. Fourteenth Amendment Claims**

Plaintiffs' final claims under 42 U.S.C. § 1983 include allegations that Defendants violated their Fourteenth Amendment rights to substantive due process and equal protection under the law.

1.  Plaintiffs' claims under the substantive Due Process Clause fail as a matter of law.

Plaintiffs contend that their substantive due process rights were violated, but they have not shown how this claim is any different from their allegations under the First and Fourth Amendments. Generally, substantive due process accords protection for matters relating to marriage, family, procreation, and bodily autonomy. *Albright v. Oliver*, 510 U.S. 266, 271-72 (1994). Furthermore, the U.S. Supreme Court has expressly stated that "where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Id.* at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

In this case, the First and Fourth Amendments provide Plaintiffs with a textual source of

---

[4] Defendants repeatedly remind the Court in their briefing that Plaintiffs deliberately orchestrated the violation of the no-bag rule and intended to get arrested. Although a "knowing" violation is an element of the obstruction statute, TMC 8.17.015, it is unclear how this fact demonstrates that the no-bag rule was constitutional as a matter of law or that Plaintiffs' "Fourth Amendment claims have no merit." [Def.'s Motion, Dkt. #64, at 10].

constitutional protection for their allegations. Therefore, they cannot seek further relief under substantive due process for the same alleged violations with the same factual basis.

    2. <u>Plaintiffs' claims under the Equal Protection Clause fail as a matter of law.</u>

Plaintiffs also allege that Defendants denied them equal protection under the law as guaranteed by the Fourteenth Amendment. In order to establish a claim under the Equal Protection Clause, a plaintiff must demonstrate that (1) she was treated differently from others similarly situated, and (2) the defendant acted with discriminatory intent. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Equal protection "is essentially a direction that all persons similarly situated should be treated alike." *Id.*

In this case, Plaintiffs have not produced any evidence that shows they were treated differently from protestors with a different message. Although Defendant Barrett admitted in his testimony that if there were counter-protestors they likely would have protested outside of the designated zone [Barrett Dep., Dkt. #77-9, at 71], Plaintiffs have not shown that different rules were actually applied to pro-war protestors. Additionally, several defendants testified that if the antiwar protestors wanted to protest outside of the designated zone, they could have done so. Because Plaintiffs have not shown any disparate impact from the restrictions implemented throughout the protest, this Court does not need to address the discriminatory intent prong under Plaintiffs' equal protection claim.[5]

In summary, Defendants have shown as a matter of law that Plaintiffs are not entitled to relief under either the substantive Due Process Clause or the Equal Protection Clause. Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' Fourteenth Amendment claims is GRANTED.

**F. Qualified Immunity**

Government officials are entitled to qualified immunity from damages for civil liability as long as their conduct does not violate clearly established statutory or constitutional rights of

---

[5] This conclusion does not affect Plaintiffs' First Amendment claims. The Court finds that although there is no evidence that suggests Plaintiffs were treated differently than others similarly situated, a reasonable jury could still conclude that the restrictions placed on Plaintiffs and other antiwar protestors were motivated by an improper intent to deter political speech, even if that intent is not manifested through disparate treatment.

which a reasonable person would have known. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). The existence of qualified immunity generally turns on the objective reasonableness of the actions, without regard to the knowledge or subjective intent of the particular official. *See id*. The purpose of qualified immunity is "to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009). Therefore, only gross incompetence is punished; reasonable mistakes are immunized.

In analyzing a qualified immunity defense, the court must determine (1) what right has been violated, and (2) whether that right was "clearly established" at the time of the incident. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court should look to whatever decisional law is available to determine whether the law was clearly established at the time the alleged acts occurred. *Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir. 1985).

    1.  <u>Whether a constitutional right was violated</u>

The first prong of the *Saucier* test for establishing qualified immunity "mirrors the substantive summary judgment decision on the merits." *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). Because there are still questions for the fact-finder as to whether Defendants violated Plaintiffs' First and Fourth Amendment rights, Defendants' qualified immunity Motion for Summary Judgment turns on the second prong.

    2.  <u>Whether the right was clearly established</u>

To be clearly established, the law must be sufficiently clear that a reasonable official would understand that his or her action violates that right. *See Saucier*, 533 U.S. at 201. While courts must look to standards and precedent to determine this prong, it is not necessary that a previous case have been decided on exactly the same facts.

In this case, it is not clearly established law that a prohibition on backpacks within a designated protest zone is a violation of the First or Fourth Amendments. Furthermore, qualified immunity protects law enforcement officials from making reasonable mistakes. Plaintiffs have not presented any evidence that indicates gross incompetence on the part of TPD. Rather,

Defendants have shown that they considered the previous events at the Port of Olympia in 2006 as well as the backpack filled with chains that was found during the Milwaukee Way Protest and concluded that the no-bag rule was a middle-ground solution in between taking no action whatsoever and implementing voluntary searches. At the time this decision was made, the right to carry a backpack into a protest zone was not clearly established. Only the plainly incompetent are punished, and therefore, this Court must conclude that the doctrine of qualified immunity protects the individual defendants in this case from any reasonable mistakes that allegedly caused violations of Plaintiffs' constitutional rights.

Accordingly, Defendants' Motions for Summary Judgment on Plaintiffs' First and Fourth Amendment claims are GRANTED.

**G. Surveillance Claim**

Plaintiffs next claim that Defendants'[6] surveillance activities during the Milwaukee Way Protest and continuing for at least two years after Plaintiffs' March 2007 arrests were a violation of Article 1, Section 7 of the Washington State Constitution.[7] Section 7 states, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Thus, courts utilize a two-pronged test to analyze an alleged violation: (1) Whether there was a disturbance of one's private affairs, and (2) Whether the disturbance was authorized by law. *State v. Athan*, 160 Wn.2d 354 (2007). Washington's constitution provides broader protection than the Fourth Amendment, and there are no explicit limitations on the right to privacy recognized under the state constitution. *State v. Cheatam*, 150 Wn.2d 626 (2003).

Plaintiffs argue that their private affairs were disturbed when Defendants (a) collected license plate information from vehicles they knew belonged to individuals protesting at the port, (b) monitored internet listservs, (c) recorded and zoomed in on protestors' faces during the

---

[6] Plaintiffs assert a surveillance claim against only Defendants Ramsdell, Sheehan, Strickland, Miller, Roberts, and Barrett.

[7] Plaintiffs also pled violations of Article 1, Section 5 of the Washington State Constitution in their original Complaint and asked for declaratory relief under that section in their Amended Complaint. However, Plaintiffs failed to respond to the arguments made by Defendants in their motion, which constitutes an abandonment of this claim. Additionally, in response to Defendants' motion, Plaintiffs attempt to assert for the first time a surveillance claim under the U.S. Constitution. It is too late for them to raise a new theory of liability. Therefore, the Court will resolve Defendants' summary judgment motion for only the allegations under Article 1, Section 7.

protest, (d) created and shared PowerPoint presentations that labeled Plaintiffs as local troublemakers based on their participation at the Milwaukee Way Protest, and (e) deployed officers to conduct "roll-bys" of Plaintiffs' homes when they were suspected of preparing to participate in lawful protests. To determine whether a person's private affairs have been disturbed, courts do not examine a subjective expectation of privacy, but instead, examine "whether the expectation is one which a citizen of the State should be entitled to hold." *State v. McKinney*, 148 Wn.2d 20 (2002).

Generally speaking, an individual does not have a privacy interest in what she voluntarily exposes to the public. *State v. Carter*, 151 Wn.2d 118 (2004). While Plaintiffs do not automatically forfeit the constitutional protection to be free from governmental trespass when they step foot onto a public sidewalk or step into a designated protest zone, their privacy expectations do necessarily decrease. Thus, even if the collection of license plate information and the video monitoring of protestors during the event could indicate an improper motive to chill political speech, such conduct cannot be considered a disturbance of private affairs within the meaning of Article 1, Section 7 of the Washington constitution. Additionally, Plaintiffs had no privacy interest in any information that they voluntarily posted on public websites or listservs, and it is disingenuous for them to claim that their private affairs were disturbed when law enforcement monitored their *public* postings.

The drive-bys of Plaintiffs' homes are also outside the scope of Article 1, Section 7. Plaintiff Coakley testified that she observed police patrol cars drive by her home on a frequent basis [Coakley Dep., Dkt. #76-1, at 6-8], but Defendants argue in their motion that Coakley lived on a busy street where officers were conducting "normal police business." [Def. Reply, Dkt. #86, at 26, n.19]. Even though Sgt. Caron stated in his testimony that he had knowledge of officers doing multiple drive-bys on individuals who were posting messages on Tacoma SDS's and PMR's websites, some of whom had been arrested at the 2007 protest [Caron Dep., Dkt. #77-10, at 9], Plaintiffs' homes were never invaded by the police, and Plaintiffs were never subjected to any type of conduct that could be considered a government intrusion into their private affairs.

Because Defendants have shown as a matter of law that they did not disturb Plaintiffs'

private affairs, it is unnecessary to address the second prong of the test. Therefore, Defendants' Motion for Summary Judgment on the surveillance claim under Article 1, Section 7 of the Washington State Constitution is GRANTED.

**H. State Law Tort Claims**

Plaintiffs allege several state law tort claims, including false arrest, false imprisonment, assault and battery, outrage, and malicious prosecution against various individually named defendants. They also contend that the City of Tacoma is liable for its employees' tortious conduct under *respondeat superior*. Defendants move for summary judgment on all claims.

1. False Arrest and False Imprisonment Claims

Plaintiff McCarthy asserts this claim against Defendants Ramsdell, Sheehan, Miller, Strickland, Roberts, Barrett, Paris, and Heilman. In order to establish a claim for false arrest, a plaintiff must prove that "the defendant violated the plaintiff's right of personal liberty or restrained the plaintiff without legal authority." *Dunn*, 676 F. Supp. 2d at 1195 (citing *Bender v. City of Seattle*, 99 Wn.2d 582 (1983)). The elements for false imprisonment are identical except that no legal authority is required for a restraint or confinement to constitute false imprisonment. *Jacques v. Sharp*, 83 Wn. App. 532 (1996). Liability may be established provided the defendant had an active role in bringing about the unlawful arrest "by some affirmative direction, persuasion, request, or voluntary participation." *Dunn*, 676 F. Supp. 2d at 1196. Probable cause is a complete defense to either claim. *Id.*

As explained above, Plaintiff McCarthy has shown that there are genuine issues of material fact as to whether law enforcement had probable cause to arrest him for violating the no-bag rule.[8] However, because qualified immunity shields the individual defendants from any liability resulting from the implementation or enforcement of the no-bag rule, Defendants' Motion for Summary Judgment on the false arrest and imprisonment claims must be GRANTED.

2. Assault and Battery Claim

Plaintiff McCarthy asserts this claim against Defendants Ramsdell, Sheehan, Miller, Strickland, Roberts, Barrett, Paris, and Heilman. Battery is the intentional infliction of harmful or

---

[8] *See supra* section II.D.2.

offensive contact with a person. *McKinney v. Tukwila*, 103 Wn. App. 391, 408 (2000). An assault is any act that causes a person apprehension that harmful or offensive contact is imminent. *Id.* Washington recognizes a form of qualified immunity for law enforcement officers, but that immunity is not "available for claims of assault and battery arising out of the use of excessive force to effectuate an arrest." *Staats v. Brown*, 139 Wn.2d 757 (2000).

Because Plaintiffs have not produced any evidence from which a reasonable jury could conclude that excessive force was used to effectuate Plaintiff McCarthy's arrest, Defendants' Motion for Summary Judgment on the assault and battery claims is GRANTED.

### 3. Outrage Claims

Plaintiffs McCarthy, Coakley, Edelbacher, and Bevis each assert an outrage claim against Defendants Ramsdell, Sheehan, Strickland, Roberts, and Barrett. Plaintiff McCarthy also asserts a claim against Defendants Paris and Heilman. Plaintiffs Coakley, Edelbacher, and Bevis assert outrage claims against Defendant Kitselman.

The tort of outrage requires a plaintiff to prove (1) extreme or outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual emotional distress. *Kloepfel v. Bokor*, 149 Wn.2d 192, 194 (2003). Defendants argue that as a matter of law the police conduct in this case does not meet the standard of "extreme or outrageous," especially considering that the claim is based on the same conduct that Plaintiffs allege violated their First Amendment rights. [Def. Motion, Dkt. #68, at 11]. In their response to Defendants' Motion, Plaintiffs failed to address any of Defendants' arguments. As a result, Plaintiffs have not shown that there is a genuine issue of material fact under their outrage claims. Therefore, Defendants' Motion for Summary on this claim is GRANTED.

### 4. Malicious Prosecution

Plaintiffs McCarthy, Coakley, Edelbacher, and Bevis each assert a malicious prosecution claim against Defendants Ramsdell, Sheehan, Strickland, Roberts, and Barrett. Plaintiff McCarthy also asserts a claim against Defendants Paris and Heilman. Plaintiffs Coakley, Edelbacher, and Bevis assert malicious prosecution claims against Defendant Kitselman.

To prove the tort of malicious prosecution, a plaintiff must show that (1) the defendant initiated or continued a prosecution, (2) without probable cause, (3) with malice, (4) in a proceeding that is abandoned or terminated in the plaintiff's favor, and (5) the plaintiff suffered injury as a result. *Hanson v. City of Snohomish*, 121 Wn.2d 552, 558 (1993). "Although all elements must be proved, malice and want of probable cause constitute the gist of a malicious prosecution, and therefore, probable cause is a complete defense." *Id.* Plaintiffs have not introduced  any evidence that shows that the criminal prosecutions were done with actual malice. Plaintiffs have not carried their burden to show that there is a genuine issue of material fact with respect to this element. Consequently, Defendants' Motion for Summary Judgment on the malicious prosecution claims is GRANTED.

## I. Federal Claims Against the City of Tacoma

A municipality is liable under 42 U.S.C. § 1983 only when an official policy, practice, or custom causes the constitutional violation at issue. *Monell v. Dep't of Social Servs*., 436 U.S. 658, 694 (1978). An official policy or practice may encompass "failure to act" claims such as the failure to train or supervise employees, and a municipality can be held liable if its failure to act caused constitutional violations. *See City of Canton v. Harris*, 489 U.S. 378, 380 (1989).

### 1. Policy or Custom

Plaintiffs argue that the City of Tacoma is liable for the constitutional violations caused by TPD's overall response to the Milwaukee Way Protest and the implementation of the no-bag rule. A policy or custom claim against a municipality may be established in one of three ways: (1) when there is a formal and official policy, (2) when there is the existence of an unlawful practice that is so permanent or well-settled so as to constitute a custom; and (3) when an officer who has authority to establish final municipal policy makes a decision that causes constitutional violations. *See Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004); *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003). "Liability under section 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

In this case, Defendants admit that they considered alternatives to the no-bag rule and consulted legal counsel when making decisions about the restrictions authorized during the protest. [Def. Motion, Dkt. #59, at 23]. Plaintiffs, however, maintain that TPD created this particular response to the 2007 protest in order to deter assumed anarchists and antiwar protestors from demonstrating at the port, and as a result, their First and Fourth Amendment rights were violated. As discussed previously, Plaintiffs have shown that there are still disputed facts regarding the course of action established and sanctioned by the Chief and Assistant Chief of TPD, including the implementation of the zero-tolerance policy, the increasing restrictions on parking, the lack of notice when the designated protest zones were changed or moved, the no-bag rule, the snipers on the rooftops, the floodlights shining directly in the zone, the use of cameras to zoom in on protestors, and the deployment of less-lethal munitions. Because Plaintiffs have shown that there is still an issue for trial with respect to whether TPD's policies caused constitutional violations, the City's Motion for Summary Judgment on this claim is DENIED.

 2. Failure to Train and Supervise

In order to find a municipality liable under section 1983 for the failure to adequately train its police officers, Plaintiffs must prove that the failure to train (1) "amounts to deliberate indifference to the rights of persons with whom the police come into contact," and (2) actually causes the deprivation of rights. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

Plaintiffs in this case argue that the City had not adequately trained its officers on how to use less-lethal munitions in the context of a political protest. [Pl. Reply, Dkt. #74, at 72-73]. They further argue that the City failed to train law enforcement on the constitutional parameters of the restrictions that could be imposed during a demonstration. [*Id.* at 75]. In support of these contentions, Plaintiffs point only to testimony from TPD officers who stated that they never received any basic training regarding the First Amendment rights of protestors. Although Plaintiffs argue that this lack of training would predictably lead to constitutional violations of protestors' rights and therefore amounted to deliberate indifference, they have not offered any evidence in support of that contention. Without expert testimony that shows what training policies would be appropriate under these circumstances, Plaintiffs have failed to meet their

burden in demonstrating that there remains an issue for trial. Accordingly, the City's Motion for Summary Judgment on the failure to train claim is GRANTED.[9]

**J. Remedies**

    1. <u>Defendants seek summary judgment on Plaintiffs' requests for declaratory relief.</u>

    Plaintiffs request a declaration from the Court that the no-bag rule violated their First Amendment rights because it was an unconstitutional time, place, and manner restriction on free speech in a traditionally public forum. In order to seek declaratory relief, Plaintiffs must establish that (1) the federal court has subject matter jurisdiction, and (2) there is an existence of an actual case or controversy. 28 U.S.C. § 2201. Generally, an actual controversy exists when the conduct in question is likely to be repeated; however, the controversy must also present a concrete and immediate threat of injury to the party seeking declaratory relief. *See Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 658 (9th Cir. 2002).

    In this case, Plaintiffs argue that the alleged constitutional violations are likely to reoccur because (1) Defendants' After Action Report on the Milwaukee Way Protest included the recommendation to "stop protestors in layers" at future events [Pl. Reply, Dkt. #74, at 58; Wang Dec., Dkt. #79-5, at 6], and (2) Defendants' planning documents for expected protests in 2008 identified plans to prohibit backpacks again. [Pl. Reply, Dkt. #74, at 58]. Nevertheless, future protests will necessarily be different—they may take place in a different location or present different concerns for law enforcement. Furthermore, Plaintiffs have not shown the existence of an immediate threat of injury that would justify declaratory relief. Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' request for declaratory relief under the First Amendment is GRANTED.

    Although Plaintiffs also seek a declaration that the no-bag rule violated their rights under Article 1, Section 5 of the Washington constitution, they failed to respond to Defendants' arguments on this claim. Because this failure constitutes an abandonment of their claim, Defendants' Motion for Summary Judgment on Plaintiffs' request for declaratory relief under

---

[9] Because Plaintiffs have not met their burden in showing that TPD's training policies were inadequate, there is no need to address whether these policies amounted to deliberate indifference. Therefore, the substance of the City's legal advice is irrelevant, and Plaintiffs' request for relief under FRCP 56(d) is DENIED.

Article 1, Section 5 of the Washington constitution is GRANTED.

Finally, Plaintiffs seek a declaration from the Court that continued surveillance unsupported by reasonable suspicion and motivated by Plaintiffs' political association violates Article 1, Section 7 of the Washington constitution. Because Plaintiffs have not demonstrated that Defendants are continuing surveillance on Plaintiffs' homes, they have not met their burden to show the existence of an actual controversy, which is required for declaratory judgment. Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' request for declaratory relief under Article 1, Section 7 is GRANTED.

    2.  <u>Defendants seek summary judgment on Plaintiffs' request to enjoin Defendants from future surveillance activities.</u>

In order to have standing to seek injunctive relief, Plaintiffs must show either (1) an actual and immediate threat of a concrete and particularized injury, or (2) continuing present adverse effects. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). Other than one unintentional disclosure of Plaintiffs' personal information by TPD, Plaintiffs have not shown that there is an actual and immediate threat of concrete injury. Abstract speculation of harm that could occur is not enough to warrant the extraordinary remedy of injunctive relief. Additionally, Plaintiffs have not presented evidence that shows they are suffering from continuing adverse effects. Although evidence shows that TPD conducted surveillance on Plaintiffs for two years after the Milwaukee Way Protest, nothing in the record indicates that TPD is continuing to do so. Plaintiffs have not met their burden, and therefore, Defendants' Motion for Summary Judgment on Plaintiffs' request for injunctive relief is GRANTED.

    3.  <u>Punitive Damages</u>

Because it is well-established that a municipality may not be held liable for punitive damages and because Defendants are shielded from civil liability under the qualified immunity doctrine, Defendants' Motion for Summary Judgment on Plaintiffs' request for punitive damages is GRANTED.

## III. CONCLUSION

The Court GRANTS in part and DENIES in part Defendants' Motions for Summary Judgment.

1. The Court DENIES Defendants' Motion for Summary Judgment on the Municipal Policy claim.

2. The Court GRANTS Defendants' Motions for Summary Judgment on all other claims.

**IT IS SO ORDERED.**

Dated this 26th day of July, 2011.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE